C. Thomas **SWATTS**, et al., Plaintiffs,

v.

**UNITED STEELWORKERS OF AMERICA, Defendant.**

**No. IP 81–780–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 24, 1984.

---

Vernon J. Petri, Indianapolis, Ind., for plaintiffs.

David M. Silberman, Washington, D.C., James B. Robinson, Cincinnati, Ohio, Carl Frankel, Pittsburgh, Pa., Barry A. Macey, Indianapolis, Ind., for defendant.

## ENTRY

DILLIN, Chief Judge.

The plaintiffs claim that the union violated its duty to represent them fairly in six ways. The Court grants the defendant's motion for summary judgment as to the following claims: that the union misrepresented the company's right to hire permanent replacements during the strike in question here, that the union misrepresented the strike fund benefits available to plaintiffs, and that the union failed to accept an offer to extend the contract term by 90 days before striking.

Three claims remain to be decided at trial. The first is whether the union illegally bargained to an impasse over a nonmandatory issue, thereby harming plaintiffs. The second is whether the union improperly influenced favored union members to cross the picket line and return to work. The third is whether the union improperly agreed to a method for determining how workers would be recalled for work when vacancies occurred after the strike.

### Memorandum

### Background

This action arises from an economic strike at the Edgecomb Metals plant in Indianapolis in 1980 and 1981. This plant was one of several formerly owned by Jones & Laughlin Steel Company (hereinafter "J & L") and was covered by the nationwide labor agreement between the Steelworkers and the nation's largest steel producing firms. The Indianapolis plant and four others used as "service centers" were governed by the same single contract between J & L and the union. In 1978, J & L sold the five plants to Edgecomb, which also owned other such "service centers," some of which had designated the Steelworkers as bargaining agents. Edgecomb accepted the terms of the nationwide steel contract as governing the five plants purchased from J & L, including the Indianapolis plant, until the end of the contract term.

When the contract term neared completion, the union and Edgecomb began to discuss a new agreement. From the beginning, Edgecomb took a tough bargaining position, insisting that workers give up a number of benefits that they had won from J & L, including an automatic cost of living pay increase. Negotiations were carried on for several months. No pact had been reached by October 1, 1980, the date the contract then in force expired, so union members in Indianapolis and several other "service centers" went on strike against Edgecomb. During the strike, the union hired strikebreakers to replace about 20 to 30 striking employees and continued to carry on its business on a limited basis despite picketing. After about three months of striking, a tentative agreement was reached; Edgecomb, however, refused to agree to terminate the workers who were hired during the strike and the union refused to agree to a new contract unless these new employees were fired.

In early March, 1981, after about five months of striking, 23 members of the union crossed the picket line in Indianapolis to go back to work, effectively ending the strike. The remaining strikers were placed on a recall list for positions to become available as vacancies occurred, but there is no evidence that any one of them has been called back to work. Once the 23 returned to work, the strike ended because Edgecomb stated that there were no longer any positions that needed to be filled. Approximately 60 workers, most or all of whom are plaintiffs in this action, were left without jobs. The union continues to represent the employees at Edgecomb—those hired during the strike and those 23 who first crossed the picket line. Their contract contains fewer beneficial features than the

original contract between J & L and the Steelworkers.

## Discussion

█ The duty of fair representation arises from § 301 of the National Labor Relations Act, 29 U.S.C. § 185, which authorizes "Suits for violation of contracts between an employer and a labor organization . . . ." This section has been held by the Supreme Court to imply a duty on the part of an exclusive bargaining agent to fairly represent the interests of the members of the bargaining unit.

> [T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). The judicially created duty originally was held to apply to the union's obligation to its members when it negotiated a contract. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed.2d 1048 (1953). It later was extended to the union's duty to its members while administering the collective bargaining agreement, *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), and suits by workers who allege that their unions improperly handled grievances under collective bargaining agreements now dominate the field of unfair representation law.

There has lately been some controversy in this circuit about the boundaries of the duty of fair representation and the standard which a plaintiff must meet to prove its breach. The court once ruled that a union's conduct violated the duty of fair representation if it was "arbitrary, discriminatory or in bad faith," and that hostility or malice on the part of the union need not be proved. This standard was stated in *Baldini v. Local 1095, UAW,* 581 F.2d 145 (7th Cir.1978). The Seventh Circuit appeared to follow this standard in *Miller v.*

*Gateway Transportation,* 616 F.2d 272, 277, n. 11 (1980), citing four Supreme Court cases to support it. The circuit seemed to narrow its view in *Hoffman v. Lonza, Inc.,* 658 F.2d 519 (1981), adopting a test requiring the union's conduct to be "intentional, invidious and directed at the employee" in order to violate the duty. Negligence by the union could not violate the duty under this standard, whereas it might have under *Baldini* or *Miller* (although bad faith appeared to be present in both those cases). Later cases cited both tests: *United Steelworkers v. NLRB,* 692 F.2d 1052 (1982); *Cote v. Eagle Stores,* 688 F.2d 32 (1982) (per curiam), *cert. denied,* 459 U.S. 1218, 103 S.Ct. 1222, 75 L.Ed.2d 458 (1983); *Rupe v. Spector Freight Systems,* 679 F.2d 685 (1982). One, however, returned to the *Baldini* standard alone; *Schultz v. Owens-Illinois,* 696 F.2d 505 (1982). The three most recent cases adopt the stricter test from *Hoffman v. Lonza: Dober v. Roadway Express,* 707 F.2d 292 (1983) (dissent by Judge Cudahy refers to *Baldini* ); *Superczynski v. P.T.O. Services,* 706 F.2d 200 (1983); *Graf v. Elgin, Joliet & Eastern Ry.,* 697 F.2d 771 (1983). The panel in *Graf* restated the standard: "The union has a duty to represent every worker in the bargaining unit fairly but it breaches that duty only if it deliberately and unjustifiably refuses to represent a worker." 697 F.2d at 778.

Both sides in this case devote much argument to the exact current status of the standard in the Seventh Circuit. In particular, plaintiffs point out that it appears to be more restrictive than the language of the Supreme Court would permit and more restrictive than the standard of all other circuits save the Third. In justifying the standard, the defendant points to the importance of limiting unions' liability to instances when it would serve the purpose of national labor policy and ensure that a union's majority does not exploit a dissenting minority.

The Court concludes that the recent debate in the Seventh Circuit with regard to the standard of duty in fair representation

cases is confined to cases having to do with grievance procedures under collective bargaining agreements. As noted above, these cases have come to dominate the field of fair representation litigation. All of the cases except one listed in the discussion above deal solely with the union's duty to adequately process and prosecute a grievance filed by a member under the terms of a collective bargaining agreement.

The matter at hand, of course, goes back to the original area covered by the duty of fair representation, the union's duty to its membership when negotiating the collective bargaining agreement in the first place. The only case in this circuit discussing the union's duty in a negotiating situation since the debate over the correct standard began is *Schultz v. Owens-Illinois, supra.*\* That case explicitly discusses a separate standard of liability in cases involving the union as bargaining agent rather than administrator of the collective bargaining agreement:

> There is one standard for appraising a union's conduct when a claim arises out of union actions in negotiating agreements with an employer and a different standard when the claim arises from a union's administration of the collective bargaining agreement, especially in the context of processing grievances....
>
> [As to negotiating agreements, the Supreme] Court recognized that the union is obliged "to represent all members of an appropriate unit [and] to make an honest effort to serve the interests of all those members, without hostility to any." [*Ford Motor Co. v. Huffman,*] 345 U.S. at 337, 73 S.Ct. at 686. The Court also recognized that in contract negotiations "[t]he complete satisfaction of all who are represented is hardly to be expected." 345 U.S. at 338, 73 S.Ct. at 686. And, the Supreme Court warned that, when assessing the conduct of the union in the course of negotiating with the employer, "[a] wide range of reasonable-

ness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. at 338, 73 S.Ct. at 686.

696 F.2d at 514. The elements of "complete good faith" and "honesty of purpose," then, are the hallmarks of the union's duty in the bargaining context.

In this action, generally, the plaintiffs' charge is that the union did not live up to those standards. Inferring the worst motives from the plaintiffs' charges, the union violated its duty by using the plaintiffs as sacrificial lambs in its own attempt to gain more power by incorporating more workers into the bargaining unit and generally consolidating the union's power against a recalcitrant employer. It did so, again reading the worst motives into the plaintiffs' charges, by deceiving its membership and ignoring plain opportunities to arrive at reasonable settlements. It also acted, when the strike collapsed, to place the strongest union supporters in the plant rather than impartially filling vacancies.

These inferences are meant to show only that the plaintiffs' allegations, taken at their worst, exceed the standard enunciated in *Schultz v. Owens-Illinois, supra.* In weighing this motion for summary judgment, however, inferences are insufficient. Under Rule 56, the plaintiffs must show that there are sufficient factual questions to merit a trial to determine the union's liability. The union must show that the undisputed facts reveal no such factual dispute and that, on the clear facts, the union has no liability for breach of the duty of fair representation.

As sharpened by the briefs regarding the pending motion, there are six claims of unfair representation raised by the plaintiffs. First, the members charge that the union misled them as to whether the company could hire permanent replacements for them during the strike. Second, they

---

\* This case involves both aspects of the duty and uses the *Baldini* test as the standard governing grievance processing.

charge that the union misrepresented the value of strike benefits that would be available to the workers. As to both of these, they allege that they would not have gone on strike had they known the truth about these matters. Third, they charge that the union unfairly refused an offer by the company to extend bargaining for 90 days at the time the contract expired. Fourth, they argue that the union illegally bargained to an impasse over a nonmandatory issue, namely the inclusion of two additional "service centers" in the Edgecomb bargaining unit. Fifth, they charge that the union discriminately informed certain workers to report back to work at the time the strike was about to be broken so that these workers would get jobs and others would be relegated to the recall list. Last, they state that the union violated its duty in failing to obtain recall by seniority. The Court will examine these claims in order.

■ 1. *Misrepresentation as to Permanent Replacements.* Before reciting the facts as to this claim, it is necessary to determine whether this claim, which deals exclusively with the relationship between a union and its members, falls under the duty of fair representation. By its name, one would expect that a claim for breach of the duty of fair representation would have to contain some element of contact between the union and employer on behalf of the employee; otherwise there would be no representation giving rise to a duty. At least three circuit courts, however, have concluded that the duty of fair representation encompasses

the union's duty not to misrepresent deliberately union bargaining efforts and positions in order to induce ratification of a newly negotiated collective bargaining agreement. *Deboles v. Trans World Airlines,* 552 F.2d 1005, 1018–20 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Retana v. Apartment, Hotel & Elevator Operators Union, Local 14,* 453 F.2d 1018 (9th Cir.1972).

*Anderson v. United Paperworkers Union,* 641 F.2d 574, 577 (8th Cir.1981). The Fifth Circuit explicitly has declined to recognize that union conduct as to its members not touching relations with the employer falls within the duty of fair representation.

The Seventh Circuit's position is unclear, as illustrated by *Distler v. United Mine Workers,* 711 F.2d 76 (1983). The case cites *Anderson* with apparent approval for the proposition that union misrepresentation to members in order to obtain ratification of a collective bargaining agreement is actionable under the duty of fair representation. 711 F.2d at 79, n. 2. But it also discusses approvingly the Fifth Circuit cases that restrict fair representation "only to union conduct arising from the union's position as representative." 711 F.2d at 79 (*quoting Bass v. Boilermakers,* 630 F.2d 1058, 1062 (5th Cir.1980). Because of this seeming conflict it is difficult to know how far this Circuit intends to go. We conclude from *Distler,* however, that the Seventh Circuit allows suit for breach of the duty of fair representation only when the conduct complained of "would touch on ... the negotiation or ratification [or] enforcement of the collective bargaining agreement." 711 F.2d at 79.

■ Here, the plaintiffs claim that "Defendant union induced plaintiffs to strike and continue striking by intentionally misrepresenting that the company had no legal right to retain replacement workers hired during the strike," Memorandum in Support of Plaintiffs' Response at 11, and that the union "misinformed and misled the workers regarding the risks involved in the strike." *Id.* at 2. But they also summarize their claim in a different way, contending that the union only "failed to inform the workers that they were risking their jobs by going out on strike." *Id.* at 5.

The factual record, including about 950 pages of deposition excerpts and affidavits provided by the defendant and 100 pages of affidavits and excerpts provided by the plaintiffs, shows that the more passive characterization of the union's conduct is correct. The first two quotations above seriously exaggerate the union's conduct as shown by all the facts in the record.

First, plaintiffs' affidavits fail to support a charge of active misrepresentation and instead support only a claim that the union "never explained ... that my job would be in jeopardy if we went out on strike." Atwood affidavit at 2; Kissner affidavit at 1; Stark affidavit at 1; Swatts affidavit at 2 (identical quotation in all four). Donald Batton, former president of the Indianapolis local, stated that "I was never told at any time by any union representative, before or during the strike, that there was any chance I could lose my job because of the strike." Affidavit at 1. Second, dozens of plaintiffs testify in depositions that the union never stated that Edgecomb could not hire strikebreakers or had to terminate them when the strike ended. *See, e.g.*, statements cited in Defendant's Memorandum in Support of Motion for Summary Judgment, n. 46. Third, several others testified that union officials dismissed statements by the company that it could hire permanent replacements as "propaganda" or "lies." *See, e.g.*, D 24 (Atwood); [†] D 172 (Glasson); D 238 (Hobson); D 290 (Klee); D 360 (Morton); D 394 (Shelton); D 423 (Stark); D 484 (Vest).

On the other hand, only two plaintiffs testify to directly misleading statements. Robert Lee Hill states that local president George Heineman told him that "it was illegal for the company to hire scabs." D 227. Plaintiff Brad R. Kinder testified that the union informed him that the company could not legally retain strikebreakers. D 269, 276.

Many other plaintiffs make clear by their testimony that they understood that the strikebreakers would depart only as part of the settlement of the strike. *See, e.g.*, P 3 (Batton); P 7 (Campbell); P 14 (Hargis); P 59 (Harville); P 67 (Kissner); P 75 (Stark); D 2 (Appleton, Jr.); D 6 (Appleton, Sr.); D 12 (Arnold); D 26 (Atwood); D 37 (Atwood); D 48 (Batton); D 66 (Bell); D 90 (Boyce); D 111 (Campbell); D 140 (Dalton); D 173 (Glasson); D 178 (Hargis); D 242 (Hobson); D 294 (Klee); D 371 (Priest); D 399 (Shelton); D 407 (Spear); D 447 (Swatts); D 468 (Taylor); D 489 (Voelkel). The union claims to have represented only what these plaintiffs understood: if union members stuck together and continued the strike, the union would prevail and the strikebreakers would be removed as part of a settlement. *See, e.g.*, D 444–447 (Swatts). There is nothing in the record to indicate that this representation lacked reasonable support in the experience of union leaders.

Under Rule 56, summary judgment may be granted when there is no "genuine issue as to any material fact" and judgment on the law is appropriate. There is no genuine issue when "it is quite clear what the truth is." *Holcomb v. United States*, 543 F.2d 1185, 1189 (7th Cir.1976) (*quoting Poller v. CBS*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). In this case, where just two plaintiffs state that misrepresentations were made at a union meeting and nearly 45 deny it, it is quite clear what the truth is. The Court finds that no active misrepresentation was made by the union in regard to the company's ability to hire and retain replacements. As well, the record shows that the debunking of "propaganda" by union officials in this instance in no way involved any active misrepresentation. It reflected union officials' reasonable attempts to reassure members that, if the strike was successful, the employers' threats would not be carried out. The Court finds that the union's only failure as shown by the evidence was that it did not in all cases inform plaintiffs that permanent replacements could be hired (although it is clear that many plaintiffs knew this fact).

Given these facts, plaintiffs must show a right to be told by their union about all the facts and laws that could have a bearing on their decision to vote for a strike in order to recover. Such a right would be similar to the "Miranda" rights of accused defendants or the right of medical patients to full

---

[†] Both plaintiffs and defendant provided deposition excerpts with pages consecutively numbered. For convenience, we cite them as "P" or "D" followed by the page number, with the deponent's name in parentheses.

information before consent. The legal question is whether the failure to inform union members of their rights in this case violates the union's duty of fair representation.

The plaintiffs cite *Teamsters Local 860 v. NLRB*, 652 F.2d 1022 (D.C.Cir.1981), where the union's conduct was judged arbitrary and violative of the duty of fair representation when it failed to inform its members of the employer's final offer prior to a strike vote. As well, in *Steele v. Brewery Workers*, 107 L.R.R.M. 2459 (N.D. Ind.1980). Summary judgment was denied on a claim that the union in bad faith misrepresented to its members the position it presented to management. Those cases are different than this one, however, because the alleged misrepresentation here is a matter of law of which general knowledge is presumed, *Kirk v. State*, 256 Ind. 480, 269 N.E.2d 751 (1971), not a matter of fact in the exclusive possession of the union.

The Court cannot conclude, nor is there any case holding, that the union had a duty to explain to its membership all the facets of the law related to economic strikes prior to the strike vote in this case. Based on the lack of direct evidence of misrepresentation and the absence of a duty to inform, the Court concludes that the union acted honestly and with good faith as required by *Schultz v. Owens-Illinois* and grants summary judgment on this claim.

█ 2. *Misrepresentation as to the Strike Fund.* The facts are less clear as to this alleged misrepresentation. The plaintiffs claim that "Defendant union intentionally induced plaintiffs to strike by falsely representing to plaintiffs that the union's strike fund would give adequate financial assistance to plaintiffs." Memorandum in Support of Plaintiffs' Response at 15. They allege that they did not know that their strike benefits would, in most cases, be $40.00 per week or less.

Three plaintiffs state in affidavits that the union rules governing distribution of benefits were not read and that the $40.00 limitation was not discussed prior to the strike. They stress that the fund was always described as having "millions of dollars" adequate to take care of the needs of plaintiffs and their families. Atwood affidavit at 4; Kissner affidavit at 3; Stark affidavit at 3. Other plaintiffs testified in depositions that strike benefits were not explained before the vote, see, e.g., P 11 (Hammond); P 60 (Harville); D 190 (Hartley); D 236 (Hobson), and that they were told the union would take care of their needs during the strike, see, e.g., P 55 (Hartley); P 65 (Kissner); P 68 (Klee).

Ray Kizzee, the union's representative to the Indianapolis local, states in his affidavit that he did explain to the membership, prior to the strike vote, the mechanics of the strike fund and the limitations on weekly benefits. He also stated that he read the applicable provisions of union rules aloud at the meeting. Affidavit at 7. Many plaintiffs also swore that the rules were read or at least discussed at the pre-strike meeting. P 76 (Swatts) (denied in his affidavit at 3); D 29 (Atwood); D 56 (Batton); D 98 (Boyce); D 131 (Cornwell); D 265 (Kinder); D 300 (Langer); D 326 (Montgomery); D 441, 454 (Swatts).

Many other plaintiffs testified that they do not remember whether the union's rules were read or whether strike benefits were otherwise explained at the strike vote meeting. Several plaintiffs did not attend the meeting so would not have heard the discussion even if it occurred. It is clear that some union members did experience financial losses related to the strike. D 3 (Appleton's car); D 11 (Arnold's farm acreage); D 91 (Boyce's utility service); D 100 (Boyce's car and home, after strike ended).

As with the preceding claim, there is here a conflict of evidence; here, however, the conflict is greater. A substantial number of plaintiffs testify that the mechanics of the strike fund were not explained prior to the strike vote, and a substantial (and larger) number testify that the fund's operation was in fact explained.

The crucial question, however, is whether any failure to inform in this case evinces

a lack of "complete good faith" and "honesty of purpose" under *Schultz*. There is no evidence that the union purposely withheld information from the members or lied to them about how the system would work. Some members clearly knew how the system worked prior to the strike vote, as their deposition testimony shows. There is no allegation that others could not have found out had they asked. The information on the strike fund, while not as accessible as that regarding permanent replacements discussed above, also is not within the exclusive control of the union as in *Local 860* and *Steele*. In such a circumstance, the Court will not expand the boundaries of unfair representation law to require the union to make certain that each and every one of its members, including those who do not attend union meetings, knows all of the rules governing distribution of strike benefits prior to the vote. In this case, some members certainly knew what the rules were; others, had they sufficient interest, could have discovered them.

Given the facts discussed above, the Court concludes that no plaintiff has stated a claim showing breach of the duty of fair representation by the union and grants summary judgment on this claim. This ruling should not be taken to preclude a state law claim under *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), for the alleged breach by the union of its own rules, not documented in the record.

■ 3. *Ninety Day Extension.* In their complaint, plaintiffs charge that the union failed to accept or even to inform its members of an offer by the employer to extend the strike deadline by 90 days and continue bargaining. Plaintiffs do not mention this argument in their memorandum except to state, without citing supporting evidence, that "Prior to the strike, the company offered to extend the contract 90 days. The union refused this offer." Memorandum in Support of Plaintiffs' Response at 3. No plaintiff mentions this issue in an affidavit.

Many plaintiffs testified to hearing rumors about an extension offer that was neither accepted nor conveyed to the membership. *See, e.g.,* P 8, D 121 (Campbell); D 109 (Burton); D 143 (Dalton); D 150 (Dean); D 245 (James); D 262 (Johnson); D 343 (Morris); D 376 (Priest); D 419 (Stachow); D 545 (Evans). Far fewer persons testified to direct information about an extension. Venice Arnold, Russell Blackwell and Daniel Shelton all testified that plant manager Jim Evans told them that the company offered an extension. D 22; D 74; D 396. Evans, however, testified only that there was a rumor of an extension and that he thought an extension would be a good idea. He had no personal knowledge that such an offer was made. P 541–46. All union negotiators offering affidavits declare that no such offer was made. *See, e.g.,* Sirolli affidavit at 15, Kizzee affidavit at 8.

The Court finds that no offer of extension was made. The plaintiffs have failed to show a genuine issue of material fact as to this claim and the defendant union merits summary judgment.

■ 4. *Bargaining over Nonmandatory Subjects.* Plaintiffs contend that the union bargained to an impasse over a nonmandatory subject, namely the inclusion of two new plants in the collective bargaining unit, and continued to insist on this term in the contract even after the strike began. This action, if proved, is an unfair labor practice under *National Fresh Fruit v. NLRB*, 565 F.2d 1331 (5th Cir.1978), and would also violate the duty of fair representation if it met the standard in *Schultz*.

Plaintiffs cite two main items of evidence on this claim. First, plaintiffs rely upon a letter sent to several locals by a district director of the Steelworkers about two months after the strike began. The letter describes the strike as a "coordinated bargaining effort" among seven plants, including two North Carolina plants not in the original collective bargaining unit. Exhibits to Declarations at 287. The author of this letter stated in a later affidavit that he was unaware at the time he wrote the

letter that adding the two North Carolina plants had been dropped as a demand by the union. Dougherty affidavit at 2. Second, plaintiffs cite a letter sent by Edgecomb to striking workers two months after the strike began. It stated that a particular offer by Edgecomb had been rejected by the union because it did not include the two North Carolina plants:

> Edgecomb's offer of December 3 was rejected by the Steelworkers who insisted that they be given all of [the elements of the] basic steel [agreement] and said that any settlement was dependent upon a prior settlement of contracts for employees at Edgecomb's Charlotte and Greensboro plants.

Memorandum in Support of Plaintiffs' Response, Exhibit G. The Court is not now prepared to state that this letter would be inadmissible hearsay at trial. There is separate deposition testimony by Charles Vest and Paul Ray that they were told by local president Heineman after the strike began that the two North Carolina plants were part of the package sought by the Steelworkers. P 78–79; D 379. Plaintiffs also cite the facts that the bargaining for all seven plants appeared to occur together, that strikes at all plants began simultaneously, and that many of the same people bargained for all seven plants.

The union again provides affidavits from all negotiators to the effect that while formation of a seven plant bargaining unit was one of the goals of the union when the contract talks began, the proposal to include the two North Carolina plants was withdrawn before the strike deadline. Sirolli affidavit at 14; Hickey affidavit at 5; Heineman affidavit at 2. These statements appear to be supported by extensive notes, which might also be admissible, taken by union officials during the negotiations. Also in the record is a final written offer by the union, apparently presented just before the strike, stating that it

> withdraws any proposals or implied suggestions that the Greensboro and/or the Charlotte, North Carolina operations be covered in any way by the renewal of the Master Agreement. Nor is the Union requiring as a basis for a settlement of the Master Agreement that a seperate [sic] Agreement be reached at either the Company's Charlotte or Greensboro, North Carolina operations.

Exhibits to Declarations at 24.

The Court cannot find that there is no genuine issue of material fact as to plaintiffs' contention that despite the language of the final offer, the union indeed insisted on continuing to bargain over the inclusion of the North Carolina plants in the contract. It is possible that the plaintiffs may prove this allegation. If they do, the Court concludes that a breach of the duty of fair representation as described in *Schultz* would probably be shown. In effect, the union would have acted to sacrifice the jobs of certain members in order to add to its bargaining unit size and increase its own strength. The lack of complete good faith and honesty required by the law would probably be present. Because of the genuine issue remaining for resolution, summary judgment is inappropriate.

■ The defendant also argues that this Court has no jurisdiction over the subject matter of this claim because bargaining to an impasse over a nonmandatory subject is an unfair labor practice. Generally, the federal courts have no jurisdiction over unfair labor practices; they are within the primary jurisdiction of the NLRB. When the unfair labor practice also breaches the duty of fair representation, however, cases hold that the courts are not ousted from jurisdiction. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Discussing this issue recently, the Seventh Circuit wrote that

> The Board and the courts exercise concurrent jurisdiction over fair representation claims.... [T]he decision whether a particular claim should be recognized as being within the exclusive competence of the Board "must depend upon the nature of the particular interest being asserted and the effect upon the administration of

national labor policies of concurrent judicial and administrative remedies."

[C]laims that arise *primarily* out of the judicially-developed duty of fair representation do not implicate "the need to avoid conflicting rules of substantive law in the labor relations area [or suggest] the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose .... [F]air representation duty suits often require review of the substantive positions taken and policies pursued by a union in its negotiation of a collective bargaining agreement and in its handling of the grievance machinery; as these matter are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater expertise to bear on these problems than do the courts which have been engaged in this type of review since the Steele decision."
*Baker v. Amsted Industries,* 656 F.2d 1245, 1250, n. 10 (7th Cir.1981), *cert. denied,* 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 468 (1982) (quotations from *Vaca v. Sipes,* 386 U.S. at 180–81, 87 S.Ct. at 911–12) (emphasis added).

■ Analyzing the claim using this test, it does arise primarily from the duty of fair representation because the member-union relationship, not the union-employer relationship, is at its heart. The Board's primary responsibility is adjudication of unfair labor practices where the union or employer is the aggrieved party, not where the union allegedly acted wrongly to harm its members. In fact, the NLRB probably could not provide relief to these plaintiffs. It cannot impose financial sanctions against the union for the violation, and because the employer was not the culpable party, probably could not reinstate the harmed strikers who are plaintiffs here. Were the employer the party allegedly at fault, giving jurisdiction to the Board would be more logical because some effective relief might be given and the Board has expertise in handling disputes between management

and the union about bargaining over non-mandatory issues. Where the employer is not involved, however, the Court sees no danger of disrupting national labor policy or encountering conflicting rules of substantive law by retaining jurisdiction. As in *Baker,* the Court is no less expert than the Board in determining whether the union's policies and positions in bargaining were fair.

The Court retains jurisdiction over this claim for trial on the merits.

■ **5.** *Selective Notification to Return to Work.* The plaintiffs also allege that the union selectively informed certain favored workers to return to work. Organizer Ray Kizzee recounted a plan whereby if

a large group of strikers went across the picket line and into the plant, the picketers should follow them and everyone should offer to return to work simultaneously. It was thought that were that to occur, the Company would then be forced to pick and choose among the strikers and, in so doing, might commit an unfair labor practice ....

Kizzee affidavit at 22–23. This plan is confirmed by George Heineman, the local president. D 507–509. It is undisputed that this particular plan was not effectuated; when a large group of strikers did cross the picket line to return to work, many union supporters held back. There was no effort by the entire union membership to force an unfair labor practice.

Plaintiff Eric Hartley remembers a different plan by union officials which he credibly recounts. "[I]f there was going to be a mass crossing of the line, then Ray and George and the union wanted some of the good loyal union people to fill those vacancies before the other ones went in and got them." P 27. "The idea was that if we got enough union people inside the plant while the strike was still going on they could relay reliable information back out to the outside." P 30. One of the leaders of this effort was to be Wayne Ruth, who in fact crossed the line and

continues to work for Edgecomb. P 45, 49. Hartley did not go back to work. Many plaintiffs testified to rumors that union officials contacted certain favored workers to urge them to return to work, D 8 (Appleton); D 44 (Basey); D 110 (Burton); D 116 (Campbell); D 132 (Cornwell); D 148 (Dean); D 216 (Hartley); D 233 (Hobson); D 259 (Johnson); D 278 (Kinder); D 320 (Montgomery); D 479 (Trobaugh); D 499 (Wessel), but Hartley's is the only testimony that union officials directly solicited certain loyal union members to break the strike.

The Court finds, however, that his testimony is sufficient to create a genuine issue of material fact. It appears clear that the sort of plan Hartley describes is at the heart of a fair representation claim: he alleges, in effect, that union leaders put the interests of union activists and loyalists ahead of those less favored. Should the finder of fact believe this story put forth by Hartley, violation of the duty could be found. Summary judgment is thus inappropriate on this claim.

■ 6. *Violation of Seniority Rules.* Finally, plaintiffs charge that the union violated its duty of fair representation when it did not insist on recall of the workers strictly by seniority and acceded to a contract with Edgecomb which failed to provide for the rehiring of a single union member who respected the picket lines established during the strike.

One part of this claim is that the union discriminately notified certain members that they should call the company to gain a place on the recall list but did not call others. The significance of this is that Edgecomb gave priority on its recall list to those who called in and expressed a desire to return to work in the order in which they called. Local president Heineman testified that he told no one to get on the list. D 507. At least one member, Larry Basey, testified that Heineman did call to tell him to put his name on the list. D 39. Ronald Boyce and Ronald Morton also state that Heineman told them to call the company immediately to get on the recall list. D 96;

D 348. These contradictions raise an issue of material fact to be tried.

The second part of the claim contends that union officials violated the duty by failing to get the company to take back workers based on seniority. Once the strike was broken, the union had to attempt to achieve this end through negotiation. Union officials describe this bargaining in their affidavits. George Sirolli stated that "the local union presidents concluded that they had no alternative but to accept the company's position," including the term that no seniority adjustments would be made in the recall list. Affidavit at 24. Thus, only the strikebreakers (including the 23 union members who returned to work in March) got jobs, except that two union officials, including Heineman, were recalled as the two least senior employees at the plant.

The union is entitled to make adjustments in seniority in a rational manner based upon relevant considerations. *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

[A] union may make seniority decisions within "a wide range of reasonableness ... in serving the [interests of the] unit it represents," *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), [but] such decisions may not be made *solely* for the benefit of a stronger, more politically favored group over a minority group. To allow such arbitrary decision-making is contrary to the union's duty of fair representation ....

*Barton Brands Ltd. v. NLRB,* 529 F.2d 793 (7th Cir.1976) (emphasis in original). *Barton* specifically holds, however, that improper motive need not be present to find a violation of the duty of fair representation.

■ The record also shows conflicting evidence as to whether the union's acceptance of the seniority changes was reasonable. Given the other evidence in the record of possible improprieties by the union, the Court concludes that there is a genuine issue of material fact as to the

reasonableness of the union's decision and that this issue should be tried as well.