C. Thomas SWATTS, et al.,
Plaintiffs-Appellants,

v.

UNITED STEELWORKERS OF
AMERICA, Defendant-Appellee.

No. 85–2688.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1986.

Decided Dec. 19, 1986.

Vernon J. Petri, Vernon J. Petri, P.C.,
Indianapolis, Ind., for plaintiffs-appellants.

David M. Silberman, AFL–CIO, Associate Gen. Counsel, Washington, D.C., for defendant-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiffs are 59 former employees of Edgcomb Metals Company's ("Edgcomb") Indianapolis plant. In 1980 they accompanied their union, defendant United Steelworkers of America (the "Union"), in a strike against Edgcomb's seven plants. The strike was unsuccessful. Edgcomb hired replacement workers and forced the Union into concessions. Plaintiffs lost their jobs. After the strike plaintiffs filed suit against the Union, alleging, *inter alia*, that the Union had breached its duty of fair representation by misrepresenting whether plaintiffs could lose their jobs by striking and whether the company could retain replacements hired during the strike. Plaintiffs also alleged that the Union had committed an unfair labor practice and breached its duty of fair representation by bargaining to impasse over the inclusion of two Edgcomb plants in North Carolina in the union-employer "master" collective bargaining agreement. The district court granted the Union summary judgment on the misrepresentation issue and found for the Union after a bench trial on the bargaining to impasse issue. We affirm.

In 1978 Edgcomb acquired five steel service centers from Jones & Laughlin Steel Company, including a service center in Indianapolis, Indiana. The Union was the collective bargaining representative for these plants. At the time of Edgcomb's acquisition, the five plants were covered under a single "master" collective bargaining agreement between the Union and Jones & Laughlin. Edgcomb agreed to honor this contract until it expired in October 1980.

Edgcomb also operated two plants in North Carolina that were not covered under the master contract. Elections at these plants in 1979 made the Union the bargaining agent for these plants as well. In its initial negotiations with Edgcomb regarding a new contract for the five former Jones & Laughlin plants, the Union sought to include the North Carolina plants under the same master contract. Edgcomb, by contrast, not only resisted including the North Carolina plants in a master contract, but sought to eliminate the master contract entirely and instead negotiate separate contracts for the individual plants.

Several meetings between the Union and Edgcomb failed to resolve differences over the scope of the contract. Additionally, the company told the Union it would no longer agree to cost of living allowances. In September 1980, the Union polled its members, who voted to strike if a collective bargaining agreement was not obtained by the expiration date. On September 30, 1980, the day before the termination of the Jones & Laughlin contract, the Union advanced a proposal which stated, *inter alia*,

> The Union withdraws any proposals or implied suggestions that the Greensboro and/or the Charlotte, North Carolina operations be covered in any way by the renewal of the Master Agreement. Nor is the Union requiring as a basis for a settlement of the Master Agreement that a separate Agreement be reached at either the Company's Greensboro and/or Charlotte, North Carolina Operations.

Union's Contract Offer to Edgcomb, Sept. 30, 1980, Appellee's Supplemental Appendix at 1.

Edgcomb rejected this offer and on October 1, 1980, the Union commenced a strike at all seven plants. On that day, Edgcomb sent the strikers a letter indicating that it had the right to hire and retain replacements. Soon afterwards, Edgcomb in fact did hire replacements for the Indianapolis plant. During the course of the strike numerous offers were considered and rejected by both sides. The Union sent many letters to its members exhorting them to stand firm. In December 1980, an Edgcomb vice-president sent strikers at the five former Jones & Laughlin plants a letter stating that the Union had rejected an

Edgcomb offer, among other reasons, because "any settlement [of the strike at the five Jones & Laughlin plants] was dependent upon a prior settlement of contracts for employees at Edgcomb's Charlotte and Greensboro Plants." Hugh H. Williamson III, Letter to Edgcomb Employees, Appellants' Appendix 2 at 27.

The Union demanded that Edgcomb fire the replacement workers while Edgcomb insisted they be retained. In February 1981, Edgcomb stated that it was making a permanent reduction in force and that strikers returning to work would have to accept the jobs available. Additionally, the company stated that strikers could not use their seniority to bump new employees except in the event of a further reduction in force. The Union rejected these terms.

On March 4 and 5, 1981, 23 strikers at the Indianapolis plant crossed the picket line, leaving 67 employees remaining on strike. Soon after, the Union officials met and concluded that the strike had failed. On March 17, 1981, the Union and Edgcomb agreed upon separate but identical contracts for the five Jones & Laughlin plants. The replacement employees were to keep their jobs. Strikers who unconditionally offered to return were to be placed on a recall list. Previous seniority was to mean nothing as to recall unless a layoff occurred after the settlement.

In July 1981, plaintiffs filed a six-count suit against the Union. They claimed the Union: 1) misrepresented the company's right to hire permanent replacements during the strike, 2) misrepresented available strike fund benefits, 3) failed to accept an offer to extend the contract term for 90 days before striking, 4) bargained to impasse over a nonmandatory issue—including the two North Carolina plants in the master contract, 5) influenced favored workers to cross the picket line and return to work, and 6) improperly agreed to methods of recall following the strike. The Union moved for summary judgment on all six counts. The court granted the Union's motion on the first three counts and found for the Union after a bench trial on the remaining three issues. Plaintiffs appeal only the issues whether the Union misrepresented the company's right to hire replacements and whether the Union bargained to impasse.

## I. Misrepresentation

Plaintiffs claim that, when they first received Edgcomb's letter announcing its right and intention to hire replacements, they contacted Union officials who dismissed the letter as "propaganda," "garbage" and "lies" and urged members to "pay no attention." Additionally they note that, in their affidavits, two Union officials admitted never warning members that striking could result in the loss of their jobs. Thus, before the trial court, plaintiffs charged that the Union both actively misled and misinformed members regarding the risks of striking and also that it failed to apprise members of the risks of striking. This, they argued, was a breach of the Union's duty of fair representation under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982). After reviewing over 1,000 pages of depositions and affidavits, the court concluded that the charge of active misrepresentation "seriously exaggerate[s] the union's conduct as shown by all the facts in the record." *Swatts v. United Steelworkers of America*, 585 F.Supp. 326, 331 (S.D.Ind. 1984). The court noted that only two affidavits claimed active misrepresentations of whether the company could hire permanent replacements. By contrast, 45 affidavits stated that the Union had never said the company could not hire replacements but had only stated that it was likely that such replacements would be dismissed upon the settlement of the strike. This, the court found, was reasonable in light of the Union leaders' prior experience. As no court had previously recognized a duty upon a union to explain to members the general hazards of striking and as the great bulk of evidence showed that the Union had not actively misrepresented issues in the strike, the court found summary judgment appropriate.

On appeal, plaintiffs contend that summary judgment was improper. They repeat that they "were consistently reassured by Union representatives Kizzee, Heineman, and Sirolli that no job loss was possible," Appellants' Brief at 11, and that the "Union deliberately lied to the strikers, telling them over and over that all company statements concerning permanent replacements were untrue." *Id.* at 12. They note that "Union representative Ray Kizzee and Local President George Heineman both admit that they did not inform plaintiffs that the strike might cost them their jobs." *Id.* This conduct, the plaintiffs argue, amounts to a breach of the Union's duty of fair representation.

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). This circuit has interpreted this test to mean, at least in cases arising out of a union's administration of the grievance system, that "courts may enforce the duty of a union to fairly represent an employee only when union conduct breaching that duty is intentional, invidious, and directed at the employee." *Hoffman v. Lonza,* 658 F.2d 519, 520 (7th Cir.1981). *See Dober v. Roadway Express, Inc.,* 707 F.2d 292, 294 (7th Cir.1983); *Superczynski v. P.T.O. Services, Inc.,* 706 F.2d 200, 202 (7th Cir.1983), *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290, 293 (7th Cir.1975).

Because of the limited nature of court intervention in this area, the Supreme Court has noted that in interpreting what conduct is arbitrary "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). "Mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." *NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir.1980).

Cases involving the duty of fair representation most often pertain to the union's representation of employees in its dealings with the employer. Some courts, however, have found the requisite arbitrary and intentional conduct when a union has made "affirmative misrepresentations" in its dealings with members. *Cf. Schultz v. Owens-Illinois Co.,* 696 F.2d 505, 516 n. 15 (7th Cir.1982). Thus, in *Anderson v. United Paperworkers International Union,* 641 F.2d 574 (8th Cir.1981), the Eighth Circuit found that a suit could lie for breach of the duty of fair representation when a union leader falsely claimed that the collective bargaining agreement established a security fund to protect workers in the event of the company's bankruptcy, and employees relied on that statement in ratifying the agreement.

Plaintiffs point to *Warehouse Union Local 860 v. NLRB,* 652 F.2d 1022 (D.C.Cir. 1981), as an instance in which mere failure to warn—as opposed to active misrepresentation—was sufficient to establish a breach of the duty of fair representation. There, clerical workers demanded a 70–cent wage increase. The employer told union representatives that if workers persisted in this demand, the clerical unit would be eliminated. The union never informed members of the employer's stance. The workers persisted with their strike and lost their jobs.

*Warehouse Union v. NLRB* is readily distinguishable from the facts at hand. There, the union representative had privileged access to company information not available to the general membership. Here, the Edgcomb letter of October 1, stating that replacements would be hired, informed workers of the company position. The information not disseminated in *Warehouse Union* was specific to the clerical workers' particular wage demand. Here, the crux of plaintiffs' complaint concerns the Union's failure to give them information that was readily available to any member of the general public—that strikers

sometimes lose their jobs because employers find replacements to fill their slots.

██ Moreover, in this case there is no evidence of the kind of intentional, invidious, affirmative misstatement that would seem to be consistent with what this circuit has required before finding a breach of the duty of fair representation in the context of a union's handling of grievances. *Cf. Hoffman v. Lonza,* 658 F.2d at 523–25 (Cudahy, J., concurring). Particularly, because the information in question was widely known, the standards applied to the Union's strike-related communications should not be more demanding than standards applied to a union acting as the exclusive representative of workers in a grievance procedure. And as the district court noted, the statements complained of were merely opinions which had "reasonable support in the experience of union leaders." *Swatts v. United Steelworkers,* 585 F.Supp. at 332 (1984). Two union members complained of misstatements, but their testimony was not supported by 45 fellow union members who attested that no active misrepresentation occurred.[1] *See Anderson v. Liberty Lobby, Inc.,* — U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact") (emphasis original).

██ Additionally, even assuming that some misstatement might have occurred, every inaccuracy should not form the basis of a federal suit. A strike often presents unique pressures. The atmosphere may be tense, charged and confused. The situation is intensely adversary. Decisions and statements are sometimes made in haste, under pressure and in the belief that the other side is disseminating manipulated or distorted information to which a response is required. Union leaders, in exhorting the membership, may voice opinions that later prove inaccurate, or make claims that turn out to be hyperbole. So long as such statements are not intentionally misleading and are not of a nature to be reasonably relied upon by the membership—rather than discounted as partisan exhortation delivered under conditions of conflict—they may not rise to the level of invidious actions barred by the duty of fair representation. To conclude otherwise would have a chilling effect on the right to strike itself by instilling a fear of unjustifiable lawsuits. We emphasize that we do not condone fabrications designed to mislead the membership. But there must be a demanding standard for measuring such violations.

Nor is plaintiffs' demand reasonable that union officials be required to warn of the dangers of striking. As the district court noted, what plaintiffs seek is a right similar to the "'Miranda' rights of accused defendants or the right of medical patients to full information before consent." *Swatts v. United Steelworkers,* 585 F.Supp. at 332 (1984). No court has recognized such a duty. On the basis of these facts, then, we agree with the district court's finding that summary judgment was appropriate.

## II. Bargaining to Impasse

Plaintiffs contend that one cause for the strike was the Union's demand that Edgcomb negotiate with the seven service centers as a unit and that this was an unfair labor practice and a breach of the duty of fair representation. In *NLRB v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the Supreme Court held that unions and employers had an obligation

---

1. The two statements which the district court singled out as indicating active misrepresentation do not in the present context appear to create a genuine issue of material fact. The statements were merely opinions, ostensibly about the law, which related to a subject whose truth was widely known and readily available.

In addition, the alleged misrepresentations were made not in private conversations with the deponents but rather in public statements heard by many other workers, none of whom indicated they ever heard union leaders promise that workers could not be fired.

to bargain with each other in good faith with respect to "wages, hours, and other terms and conditions of employment...." The duty is limited to those subjects, and within that area neither party is legally obligated to yield. As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree.

*Id.* at 349, 78 S.Ct. at 722 (citation omitted). The Court added, "it does not follow that, because the company may propose these clauses, it can lawfully insist upon them as a condition to any agreement." *Id.*

■■■ The insistence on a nonmandatory subject constitutes an unfair labor practice. The size of the bargaining unit has frequently been found to be such a nonmandatory bargaining subject. *See National Fresh Fruit & Vegetable Co. v. NLRB*, 565 F.2d 1331, 1334 (5th Cir.1978); *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 602 F.2d 73, 76 (4th Cir.1979); *Newspaper Printing Corp. v. NLRB*, 625 F.2d 956, 963 (10th Cir.1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). However, the fact that a union cannot insist upon a nonmandatory bargaining subject as a sine qua non for its acceptance of a collective bargaining agreement does not mean that it cannot pursue a nonmandatory bargaining subject at all. As the District of Columbia Circuit explained in *Oil, Chemical and Atomic Workers International Union, Local 3–89 v. NLRB*, 405 F.2d 1111 (D.C.Cir.1968):

> What is forbidden is such insistence on a nonmandatory proposal that a failure to bargain on the mandatory subjects results. *Borg-Warner* and its progeny are concerned not with nonmandatory proposals which are included to enhance the attractiveness of offers made on mandatory subjects. Nor do they forbid ... packages and proposals which economically augment the mandatory proposals in an effort to secure acceptance of nonmandatory ones. This is the very fabric of effective collective bargaining. This court has previously recognized that a party "ha[s] a right to present, even repeatedly, a demand concerning a non-

> mandatory subject of bargaining, so long as it [does] not posit the matter as an ultimatum." What the Act prohibits is a party's insistence to the point of impasse upon a nonmandatory proposal, so that acceptance of the proposal becomes "a condition precedent to accepting any collective-bargaining contract."

*Id.* at 1117 (citations and footnote omitted).

■■■ Following a bench trial the district court found as a fact that the Union did not insist on the inclusion of the two North Carolina plants as a prerequisite to signing the collective bargaining agreement. As noted, the day before the strike the Union submitted a proposal to Edgcomb which stated:

> The Union withdraws any proposals or implied suggestions that the Greensboro and/or the Charlotte, North Carolina operations be covered in any way by the renewal of the Master Agreement. Nor is the Union requiring as a basis for a settlement of the Master Agreement that a separate Agreement be reached at either the Company's Greensboro and/or Charlotte, North Carolina Operations.

Union's Contract Offer to Edgcomb, Sept. 30, 1980, Appellee's Supplemental Appendix at 1. The district court noted: "At the very first negotiating session following the [beginning of the] strike the Union both volunteered and also answered in response to a direct question from the Edgcomb negotiator that the North Carolina plants were not an issue." *Swatts v. United Steelworkers of America*, mem. op. at 9 (August 30, 1985). Moreover, Edgcomb's attorney and principal negotiator stated in his deposition that after September 30, 1981, there was never a demand that the North Carolina negotiations be bound into negotiations with the other five plants.

Although plaintiffs point to the December 5 letter from Edgcomb's vice-president stating that the Union insisted on resolution of the North Carolina contracts as a condition for ending the strike, the district court noted that this vice-president was not present during negotiations. The vice-pres-

ident's letter contained certain false statements and omitted facts, for example, that Edgcomb was trying to eliminate cost of living allowances. Additionally, this vice-president certainly had a motive to prejudice Union members against their Union.

Plaintiffs also based their bargaining to impasse charge on the fact that representatives of the North Carolina locals sat in on the negotiations for the other five plants, and on the numerous references in the strike bulletins that all seven units were hanging together. The district court concluded that this only demonstrated a coordinated bargaining strategy, which is permissible. *See NLRB v. Indiana & Michigan Electric Co.*, 599 F.2d 185 (7th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980). After reviewing the evidence, the district court concluded, "In the final analysis all that we have in this case are recriminations over a strike that failed." *Swatts v. United Steelworkers of America*, mem. op. at 11 (Aug. 30, 1985).

The district court's findings of fact are subject to review under the clearly erroneous standard. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

On appeal, plaintiffs contend the court was clearly erroneous because the evidence showed "an open, intentional decision by the Union to favor its members employed at the North Carolina facilities while risking the jobs of members covered by the Master Agreement." Appellants' Brief at 25. In addition to committing an unfair labor practice by bargaining to impasse, plaintiffs argue, the Union violated the intentional, invidious standard enunciated in *Hoffman v. Lonza*, 658 F.2d 519.

Although bargaining to impasse in flagrant disregard of union members' interests might in some circumstances be both a breach of the duty of fair representation and an unfair labor practice, we agree with the district court that the facts here show neither a bargaining to impasse nor an intentional and invidious disregard of workers' rights.

In addition, an argument can be made that the standard to which a union should be held in conducting contract negotiations may be somewhat less demanding than that applicable to the grievance procedure. In the grievance procedure, if a union fails to present an employee complaint effectively, the employee has been denied representation by the agent exclusively authorized to provide it. The loss to the employee involved may be clear and there may be no arguable gains to others. By contrast, when a union is negotiating a collective bargaining agreement for its members, there are frequently a number of postures which it may reasonably assume in representing the diverse, and sometimes conflicting, interests of its members. To respond to all the exigencies of the contract negotiating process, a union must have broad discretion to determine bargaining strategy, including what nonmandatory subjects are to be introduced and pressed. It is conceivable that a nonmandatory subject could be pressed with such disregard of membership interest as to justify court intervention, but this would seem to be an exceptional case. The need for judicial intervention is at least in theory less pressing in the case of contract negotiation than in the matter of the grievance procedure. *See Schultz v. Owens-Illinois Corp.*, 696 F.2d 505, 514–15 (7th Cir.1982) (concluding that Supreme Court implicitly recognizes two separate standards for fair representation cases for negotiating contracts and for processing grievances; union gets "wide range of reasonableness" on former, not such broad discretion on latter); Leffler, *Piercing the Duty of Fair Representation: The Dichotomy Between Negotiations and Grievance Handling*, 1979 U.Ill. L.Rev. 35, 64 ("the union is held to a more exacting duty in handling employee grievances than in negotiating for a contract");

*cf. United Independent Flight Officers v. United Air Lines,* 756 F.2d 1274, 1281 (7th Cir.1985) ("The duty to fairly represent [union] members extends both to the negotiation and to the administration of the collective bargaining agreement, though the standards applied in the two contexts may be somewhat different."). A worker may often be alone in pursuit of a grievance. If dissatisfied with the grievance procedure, he may be alone in seeking changes of representation. In the case of contract negotiations, on the other hand, the union's strategy affects all, or a great many, union members, who may express collective dissatisfaction through coordinated efforts to influence union policy, or seek a new union or new leadership for an existing union. Where, as here, local union members believe their interests are being short-changed in favor of national objectives, local union leadership can certainly press the national body to heed their claims. In any event, the district court found, and we agree, that the Union did not press the nonmandatory issue to impasse, so the legal effect of its doing so is not before us.

The judgment of the district court is therefore AFFIRMED.