825 F.2d 608
 126 L.R.R.M. (BNA) 2046, 107 Lab.Cas. P 10,104
 TEAMSTERS LOCAL UNION NO. 42, a/w International Brotherhood
of Teamsters, Chauffeurs, Warehousemen and Helpers
of America, Petitioner, Appellant,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Appellee.
 No. 86-2011.
 United States Court of Appeals,
First Circuit.
 Heard June 1, 1987.
Decided Aug. 12, 1987.
 
 Gabriel O. Dumont, Jr., Boston, Mass., with whom H. David Kelly, Jr., and Grady, Dumont & Dwyer were on brief, for petitioner, appellant.
 John Welsh, Boston, Mass., with whom Susan L. Williams, Supervisory Atty., Rosemary M. Collyer, Washington, D.C., General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, were on brief, for respondent, appellee.
 Before BREYER and SELYA, Circuit Judges, and RE,* Judge.
 SELYA, Circuit Judge.
 
 
 1
 This case is before us at the behest of Teamsters Local Union No. 42 which seeks to set aside a finding of the National Labor Relations Board. The Board determined that the union committed an unfair labor practice in violation of 29 U.S.C. Secs. 158(b)(1)(A), (b)(2), see Teamsters Local 42, 281 N.L.R.B. No. 132 (Sept. 30, 1986), and has now cross-applied for enforcement of its order. In chasing down the myriad arguments of the parties, we have pursued both the fox of enlightenment and the hare of obfuscation through the bramble of labor law. Our hunt having drawn to a close, we reject Local 42's petition and enforce the order.
 
 
 2
 * This drama unfolds in the course of the business of the J.W. Daly Company (Daly), a distributor of hospital supplies and kindred products. Daly originally operated separate facilities within Massachusetts, situated in Lynnfield and Lawrence, respectively. From 1977 on, Local 42 represented the warehousemen at Lynnfield. The Lawrence contingent, however, eschewed unionization for many years. Then, the winds of change began to blow.
 
 
 3
 Sometime during 1982, it became known that Daly had decided to consolidate operations under one roof. The plan was to expand the Lynnfield facility and to shift the Lawrence employees there. When personnel moved from one facility to another, Daly's established practice--a practice consistent with the plantwide seniority provisions of the collective bargaining agreement then in effect at Lynnfield--was to treat transferred employees as new hires for seniority purposes. Anticipating the consolidation, several denizens of Lawrence made an exploratory contact with the union in January 1983. This initial contact quickly ripened into a full-blown dialogue. That spring, after some preliminaries which we need not recount, Local 42's vice president, Philip Morin, sent the Lawrence warehousemen a letter outlining what he thought to be added advantages of union membership in light of the anticipated move from Lawrence to Lynnfield. For instance, if they joined the union immediately, Lawrence employees would be eligible for special past service credits in the union's pension plan--credits which would be totally unavailable if they waited until they were actually transferred before enlisting in the union.
 
 
 4
 Even at this early date, seniority was a central issue. The key was "dovetailing" versus "endtailing". Under a dovetailed system, seniority within a merged unit is calculated according to length of company service. Under an endtailed system, length of union membership is determinative of seniority. The distinction threatened to be a critical one. If endtailing won out, the "new" union members--comprising, initially, all of the Lawrence employees--would be ranked behind the "old" union members (i.e., the entire Lynnfield crew) at the expanded Lynnfield workplace. If dovetailing prevailed, however, seniority would be determined for each individual based upon years in Daly's employ, irrespective of past union membership. Under that scenario, many Lynnfield-based workers would be junior to veteran Lawrence-based workers.
 
 
 5
 In writing about what life at Lynnfield would be like, Local 42 proposed a strict endtailing regimen with only a minor concession: the union agreed that it "would negotiate to retain seniority for vacation purposes ... [but] would not negotiate to have [Lawrence employees] slot in ahead of anybody presently [working] in Lynnfield." In June 1983, Morin met with the Lawrence employees to review the perceived benefits of unionization. He stated that, for all purposes other than vacations, Lynnfield employees would have seniority over Lawrence employees. In other words, the latter would be endtailed after the former. The only way dovetailing would occur, according to Morin, was if the dominant Lynnfield group acceded--not a likely possibility.
 
 
 6
 The Lawrence contingent decided to join Local 42. On July 1, 1983, Daly recognized the union as the bargaining representative for the Lawrence warehousemen. A collective bargaining agreement, virtually identical to that in effect at Lynnfield, was executed. Neither contract contained any provision dealing with the manner of calculating seniority in the event of a company-wide relocation.
 
 
 7
 During the remainder of 1983 and continuing into 1984, the Lawrence warehousemen objected to the endtailing concept, particularly to the prospect that they might be endtailed behind newly-hired Lynnfield staffers. To assuage these concerns at least in part, Daly and the union agreed on October 14, 1983 that "all Lawrence ... employees will have seniority after Lynnfield employees at year end, but that any new employees after 1/1/84 from either office will be junior in seniority to either group...."
 
 
 8
 Yet, while this adjustment was being worked out, a more momentous change was brewing. As time marched on, Daly abandoned its plans to consolidate operations at Lynnfield. Instead, the company purchased property to build an entirely new plant in Peabody, Massachusetts. In the fall of 1983 (presumably before the October 14 side agreement was executed), sketches of the new facility were displayed to employees in both Lawrence and Lynnfield. The following spring, the company informed the union that the proposed Peabody plant would operate on two shifts.[1] On November 15, 1984, Local 42 disseminated a memorandum notifying certain warehousemen that they would be assigned to the second shift at Peabody.
 
 
 9
 In January 1985, the employer and the union held a summit meeting: a final negotiating session to conclude arrangements for the double shift at the new facility. During this meeting, a company official (James Daly, then the Lawrence plant manager) questioned the endtailing of the Lawrence employees and their consequent loss of seniority. The response from across the table was icy: an adamant refusal on the part of the union leadership to consider dovetailing the work force. The longer union membership of the Lynnfield employees was cited as the reason. On June 6, 1985, the Lynnfield and Lawrence plants were folded into the new Peabody facility. Multiple shifts went into effect for the first time. Certain openings on the day shift were filled by refugees from Lynnfield, who enjoyed greater seniority under the endtailed system but who were junior to some former Lawrence employees in terms of past company service. The latter were banished to the night shift.
 
 
 10
 An unfair labor practice charge was filed before the first worker drew a breath of evening air on any nocturnal shift. Following a hearing, the administrative law judge (ALJ) determined that Local 42, by its intransigent refusal to consider dovetailed seniority at the Peabody location, had committed an unfair labor practice. The union was ordered (1) to cease and desist from declining to negotiate this issue and (2) to take affirmative steps allowing the creation of a dovetailed seniority list. Local 42's exceptions to the ALJ's decision were unavailing; the Board affirmed the rulings, findings, and conclusions, and adopted the ALJ's recommended order with but a minor modification, not relevant here.[2] The instant proceedings thereupon ensued.
 
 II
 
 11
 We start our odyssey with a decurtate discussion of certain by-now-familiar principles which touch upon the relationship between a trade union and its constituents. The National Labor Relations Act imposes upon a union the responsibility fully and fairly to represent all of the employees in a bargaining unit. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL-CIO, 425 F.2d 281, 283-84 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970). This duty requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca, 386 U.S. at 177, 87 S.Ct. at 910. The courts have consentiently held that dereliction of this duty constitutes an unfair labor practice in violation of Sec. 8(b)(1)(A) of the Act, 29 U.S.C. Sec. 158(b)(1)(A). See NLRB v. Local 282, Int'l Bhd. of Teamsters, 740 F.2d 141, 145 (2d Cir.1984) (collecting cases). And, a union likewise violates Sec. 8(b)(2) of the Act, 29 U.S.C. Sec. 158(b)(2), "when it causes an employer to discriminate against employees on arbitrary, hostile or bad faith grounds...." Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 799 (7th Cir.1976).
 
 
 12
 Thus, a union may not, without a legitimate purpose, take action favoring some of its members at the expense of others. Laborers and Hod Carriers Local No. 341 v. NLRB, 564 F.2d 834, 840 (9th Cir.1977); Barton Brands, 529 F.2d at 800. In particular, a union may not neglect the interests of a membership minority solely to advantage the membership majority. Union members are to be accorded equal rights, not subjugated arbitrarily to the desires of a "stronger, more politically favored group...." Barton Brands, 529 F.2d at 799. Accord Branch 6000, Nat'l Ass'n of Letter Carriers v. NLRB, 595 F.2d 808, 812-13 (D.C.Cir.1979); Truck Drivers and Helpers, Local Union 568 v. NLRB, 379 F.2d 137, 142 (D.C.Cir.1967). These tenets strike home when a union attempts to prefer workers based solely on how long they have been loyal to the guild. "Discrimination in seniority based on nothing else but union membership is arbitrary and invidious and violates the union's duty to represent fairly all members of the bargaining unit." Jones v. Trans World Airlines, Inc., 495 F.2d 790, 797 (2d Cir.1974).
 
 
 13
 The proceedings before us present, in essence, two questions. The first of these requires us to ask: did Local 42, by spurning any consideration of a dovetailed seniority system at Daly's Peabody plant, violate the duties owed to the former Lawrence warehousemen under 29 U.S.C. Secs. 158(b)(1)(A), (b)(2)? If not, the matter is at an end. If so, however, a second inquiry must be undertaken, one which contains a temporal dimension: have the affected employees seasonably challenged the union's tactics? The Board answered both of these interrogatories in the affirmative. Mindful of the protective sheath of obligation which safeguards the rights and privileges of even the most junior union member, we turn to the task at hand.
 
 
 14
 In so doing, we recall that the NLRB's findings of fact are conclusive if bottomed upon substantial evidence in the record considered as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 493, 71 S.Ct. 456, 464, 467, 95 L.Ed. 456 (1951); Horizon Air Services, 761 F.2d at 25. Provided the findings are so supported, the courts ought not disturb the Board's choice between competing views, or its credibility determinations. Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464. After all is said and done, conflicts and contradictions in the evidence, within the broadest of parameters, are for the Board to resolve.
 
 III
 
 15
 The Board ascertained that "the represented employees at both locations formed one new unit at the time that they moved simultaneously into the Peabody facility." Not only was this the kind of finding in which the NLRB could properly bring its expertise to bear, see generally Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464, but it was also a finding bulwarked by strong evidence. At the time of the move, the Lawrence and Lynnfield warehousemen, though represented by the same local, adhered to separate collective bargaining agreements. These pacts--which ran to April 1986--had much in common. Under each, seniority was limited to one particular location, i.e., the Lawrence agreement governed seniority at Lawrence, the Lynnfield agreement governed seniority at Lynnfield. Neither contained any provision for constructing a seniority ladder at a different (third) location. Thus, the matter of seniority at Peabody was an open one.
 
 
 16
 The Board also found that the union opposed dovetailing the two groups "because of the[ ] greater numbers and lengthier union membership [of the Lynnfield clique] in preference to the Lawrence employees," and in order to placate the former. The accuracy of this finding is so patent that we need discuss it but briefly. In January 1985, while negotiating the contours of a prospective second shift at Peabody, union officials flatly refused to consider dovetailing. James Daly recalled that Fred Frenzo, a union agent, protested that one could not "bring new employees into the union and just slot them in. They've got to go at the end." There was testimony that, on various occasions, Herbert Bryson, yet another union representative, justified endtailing on the ground that the Lynnfield workers had "been in the union longer than the Lawrence people." Morin had made similar pronouncements. And these beliefs were acted upon: Arthur Hoffman, the chief steward, testified that he prepared the endtailed seniority list and ranked the Lynnfield employees first because they had invested more time in the union.[3]
 
 
 17
 The long and the short of it is that the Board was entirely justified in concluding that the insistence upon endtailing--the preferment of Lynnfield workers over their Lawrence counterparts--constituted both discrimination in assigning seniority (i.e., disparate treatment based solely upon longevity in union membership) and a breach of the union's duty fairly to represent all of its members.
 
 
 18
 Local 42 attempts to posture its behavior as nothing more than a rational determination of seniority among groups of represented employees according to their length of tenure under a collective bargaining agreement. Apparently, the union wants us to treat this case as though it involved only the resolution of competing employee interests within a single bargaining unit and pursuant to a single collective bargaining compact. But, we cannot address the case in these terms, for the record paints a different portrait. Put in a realistic perspective, the issue before us involves the creation of a new bargaining unit from the merger of two discrete bargaining units, each with its own contract. Whether scanned alone or in the ensemble, these pacts do not resolve the question of how to order seniority in a new unit created by the consolidation of the two preexisting units. Neither contract contained language compelling Local 42 to adopt an endtailing system at Peabody--an entirely fresh facility. Seniority which had accrued under either of the original contracts was necessarily restricted to the particular facility to which the contract pertained. Such seniority could not automatically be transferred to a third location. That was a matter for the bargaining table.
 
 
 19
 To the extent that the union leans for support on our decision in NLRB v. Whiting Milk Corp., 342 F.2d 8 (1st Cir.1965), it gains little. In Whiting, we construed a clause in a multi-employer collective bargaining agreement which provided in substance that "in the event of acquisition by a signatory company of another Union company the seniority of the Union employees of the latter carried over into the acquiring company." Id. at 9. (The agreement covered several employers and dealt specifically with the seniority of unionized employees in the event ownership of a constituent company changed.) We upheld the agreement as valid, though it gave no carryover seniority rights to the previously unrepresented employees who challenged the legality of the clause. Id. The distinctions between Whiting and the case before us are glaring. In Whiting, the existing contract served as a blueprint which dictated the shape of the seniority ladder.[4] There was no such antecedent contractual blueprint at Peabody. There, the issue of seniority was not foreordained by any existing pact; it was an unresolved matter suitable for collective bargaining. It follows inexorably that the union's attempt to justify endtailing at the new site because of "length of service" or on the authority of Whiting merely restates--and reemphasizes--its breach of duty. In the present circumstances, Local 42 could not arbitrarily endtail the Lawrence warehousemen solely because of their shorter union tenure.
 
 
 20
 Local 42 also argues that its decision to endtail Lawrence personnel was insulated from the charge because it was made before those employees came under the union's wing. Inasmuch as the affected group was not then represented by the union, this thesis runs, no contemporaneous duty of fair representation arose. We find this contention to be jejune. The union was first recognized as the bargaining agent for the Lawrence warehousemen in mid-1983, at a time when the company planned to consolidate operations at Lynnfield. Endtailing there--at an existing facility, earlier unionized--was altogether consistent both with Daly's established practice and with the collective bargaining agreement in effect at Lynnfield. Had the company carried out this original plan, endtailing at Lynnfield might well have passed muster. But, that plan was aborted. By the time of the move to Peabody--a move which produced an entirely new bargaining unit, see supra--the union had long since undertaken to represent Lawrence warehousemen. It owed them, no less than the Lynnfield clique, a duty of fair representation. The Board was well within its domain in finding that the union "could not refuse to consider or negotiate a dovetailing system solely because the Lawrence employees joined [the Union] more recently than did the Lynnfield members."
 
 
 21
 In the simplest terms, the union, heedless of the rights of its Lawrence-based members, unilaterally decided that, for seniority purposes at Peabody, "length of service" should be defined to mean "length of membership in the union." In so doing, Local 42 impermissibly preferred one membership group over another, without legitimate reason. The caselaw teaches that such arbitrary conduct is the stuff of which unfair labor practices are rightfully fashioned. See Barton Brands, 529 F.2d at 798-99; Jones, 495 F.2d at 797. The union's voluntary decision to deep-six any consideration of dovetailed seniority in order to elevate its self-serving "length of service" criterion to a more significant plane was taboo.
 
 
 22
 For these reasons, we uphold the Board's determination that it was a breach of the union's duty of fair representation to eschew negotiation and by fiat to endtail the Lawrence employees at the new Peabody site based exclusively on their more recent union membership. We agree with the Board that Local 42's action had the effect of penalizing the Lawrence employees for having exercised their right to refrain from joining any union prior to mid-1983. Such a penalty was not within the local's lawful power to impose. And, we conclude that preferring the Lynnfield workers in this fashion and for a proscribed reason constituted an unfair labor practice. Thus, unless the petitioner is correct in proposing that the proceeding against it was impermissibly stale, see infra Part IV, the Board's order merits enforcement.
 
 IV
 
 23
 Local 42 contends that the instant complaint was time barred under Sec. 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b), and that the Board erred in concluding otherwise. We begin this phase of our inquiry with the statute itself, which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board...." 29 U.S.C. Sec. 160(b). The lore of the statute refines its meaning. It is settled that the limitations clock does not begin to tick until the charging party has notice that an unfair labor practice occurred. Stone Boat Yard v. NLRB, 715 F.2d 441, 445 (9th Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); NLRB v. Allied Products Corp., 548 F.2d 644, 650 (6th Cir.1977). This principle, too, has been further refined: the Board has held that the clock starts when "a final adverse employment decision is made and communicated to an employee," United States Postal Service Marina Mail Processing Center, 271 N.L.R.B. 397, 400 (1984), rather than when the decision takes effect.
 
 
 24
 In the case at bar, one of the aggrieved employees filed the charge on April 2, 1985.[5] This was some two months before the opening of the Peabody plant and the concomitant introduction of the second shift. The Board found "no evidence that a final adverse employment decision was unequivocally communicated to the Lawrence employees prior to 15 November 1984," the date when the union notified a cadre of Lawrence warehousemen that they would be on the second shift at Peabody. Having meticulously canvassed the record as a whole, we are confident that the notice finding enjoys substantial support. Accordingly, the Board's conclusion that the charge was filed within the six month limitations period cannot be uprooted.
 
 
 25
 The union's exhortations to the contrary comprise much bleat, but little wool. Local 42 asserts, first, that the applicable Sec. 10(b) period was triggered at the early 1983 meeting where the Lawrence workers were informed that they would be endtailed if the company's operations were consolidated at the existing Lynnfield facility. But, as we have explained, the unfair labor practice could not conceivably have arisen then. The union, arguably, had grounds to insist upon endtailing at Lynnfield because of the provisions of the collective bargaining agreement in effect there. See supra Part III. No such grounds applied when a brand-new bargaining unit was created by the erection and staffing of the Peabody plant. Inasmuch as the unfair labor practice blossomed only when the union insisted on endtailing at Peabody, notice of an intent to endtail at Lynnfield was insufficient to wind the limitations clock as to the instant charge.[6]
 
 
 26
 The union next contends that the Sec. 10(b) period began to run when the company agreed that "all Lawrence ... employees will have seniority after Lynnfield employees at year end ...," a bargain which Local 42 struck on October 14, 1983. We find the union's reliance on this side agreement to be doubly mislaid. In the first place, lack of communication of a final, adverse decision is fatal to any contention that the making of the side agreement started the Sec. 10(b) clock. See Postal Service, 271 N.L.R.B. at 400. Local 42 utterly failed to establish that notice of this compromise was communicated in any way to the Lawrence warehousemen.
 
 
 27
 Secondly, although the October 14, 1983 side agreement may effectively have disposed of the dovetailing/endtailing quandary with reference to warehousemen hired by Daly in 1984 and thereafter, there is nothing in the record to suggest that it constituted a final disposition of the issue with respect to veteran employees when and if operations were effectively consolidated at Peabody. After all, the groundbreaking for the facility had just occurred. The plant would not open until nearly two years later. It is no exaggeration to state that the inauguration of multiple shifts was then but an uncommunicated gleam in management's eye. On this record, any knowledge possessed by the Lawrence employees in October 1983 about plans for the Peabody facility (and about their fate, once they were ensconced therein) could not have been more than fragmentary, inchoate, and anticipatory. Indeed, the record makes manifest that, as late as January 1985, endtailing had not been accepted: it was in this time frame that the employer, in the person of James Daly, questioned the propriety of such a practice once operations commenced at Peabody. And it was then that Local 42 adopted the stiff and unyielding resistance to any consideration of dovetailing which, ultimately, led to this litigation.
 
 
 28
 The 1983 maneuverings were plainly preliminary to the main event--seniority within the virgin bargaining unit when the Peabody plant opened its doors in 1985. Even though these skirmishes cast a long shadow, they did not foreclose the rights of the quondam Lawrence work force. Knowledge of a party's predisposition to commit an unfair labor practice or suspicion that, when the moment is opportune, the knife thrust will follow, is not enough to galvanize Sec. 10(b). The statute begins to run only when the impermissible act or omission--the unfair labor practice--actually takes place. See American Distributing Co. v. NLRB, 715 F.2d 446, 452 (9th Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984); NLRB v. Al Bryant, Inc., 711 F.2d 543, 547 (3d Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984).
 
 
 29
 As we see things, the NLRB's finding that no unequivocal notice of the final, adverse endtailing decision was communicated to the Lawrence warehousemen before November 15, 1984 was substantially supported by the record. The same holds true of the subsidiary finding that the dealings earlier in 1983 "lacked the requisite definitiveness and certainty" to alert the affected employees to the problem which erupted when the Peabody plant was ready to go on line. Accordingly, we are constrained to agree with the Board that the unfair labor practice charge was timely filed in this case.
 
 V
 
 30
 Having cleared a path through the thicket, we spy little merit in any of Local 42's defenses. Quite the contrary is true. A careful review of the record persuades us that the NLRB's findings rest upon solid terrain, and that no discernible errors of law skewed its judgments.
 
 
 31
 We need go no further. For the reasons which we have elucidated, we rule that the Board's order in these proceedings was fully supportable. The union's petition for review is denied and dismissed, the cross-application is granted, and the Board's order is
 
 
 32
 Enforced.
 
 
 
 *
 Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 There was some indication that the union, through the usual sort of grapevine, may have heard rumblings about the second shift at an earlier date. If so, there is nothing in the record to suggest that any such knowledge was communicated to the work force at that time in any authoritative way
 
 
 [2]
 In view of the method and manner of affirmance by adoption, we shall refer to the ALJ's findings as the Board's. See NLRB v. Horizon Air Services, Inc., 761 F.2d 22, 24 n. 1 (1st Cir.1985)
 
 
 [3]
 Although Hoffman lamely attempted to amend this testimony in response to a subsequent leading question, the factfinder was plainly entitled to credit the original (unexpurgated) version
 
 
 [4]
 Ironically, Whiting is closely analogous to the circumstance which would have arisen had the Lawrence warehousemen been transferred to Lynnfield, as originally contemplated. Seniority rights in that situation were already covered by the collective bargaining agreement in effect at the Lynnfield plant
 
 
 [5]
 A hint of mystery attends the original charging party, Ralph Zahn. Although Zahn was likely a Lawrence employee who was inappropriately endtailed, see General Counsel's Exhibit 4, his name does not appear on the November 15 night shift list. But, the union has not questioned Zahn's standing to file the charge, and--inasmuch as the November 15 memorandum constituted the first effective notice of the interdicted action--he could not have been chargeable with notice, whatever his role, earlier than that date
 
 
 [6]
 The union relies heavily, but incorrectly, on Bowen Products Corp., 113 N.L.R.B. 731 (1955), for the proposition that the Sec. 10(b) period begins to run from the time the seniority decision is made and not from the time the employee learns he will suffer harm as a result of it. In mounting this argument, the union conveniently ignores the requirement that a final adverse employment decision be communicated to affected employees in order to trigger the limitations period. This requirement was clearly met in Bowen Products. Just as clearly, no sufficient communication occurred in this case before November 15, 1984. The charge, of course, followed comfortably within the six months next succeeding