Hiram **ALICEA**, David Arocho, Cristobal Henriquez, Neftali Irrizary, Felix Martinez, Hector Martinez, Luis A. Medero, Angel Negron, Iris Rivera, Wilson Rivera, Edel Luis Rodriguez, Jose D. Sanchez, Santana Santiago, Wilma Santos, Luis Serrano, Esther Rebecca Torres, Angel Yournet, Plaintiffs,

v.

**SUFFIELD POULTRY, INC.** d.b.a. Royal Harvest Foods and United Food and Commercial Workers Union, AFL–CIO, Local No. 1459, Defendants.

Civ. A. No. 85–0461–F.

United States District Court,
D. Massachusetts.

April 17, 1989.

al Harvest and their Union, United Food and Commercial Workers' Union, AFL–CIO, Local No. 1459 (hereinafter "the Union"). The suit against the employer alleges a violation of the governing Collective Bargaining Agreement (hereinafter "CBA") resulting in Royal Harvest terminating the workers after they staged a wildcat strike for this perceived violation. Plaintiffs' claims against their Union state that it violated its duty of fair representation by failing to grieve a legitimate dispute precipitating the strike and by encouraging some of the employees to engage in the illegal strike. Defendants moved for summary judgment arguing that there is no factual support behind these accusations and that, as a matter of law, plaintiffs' complaint fails. This Court referred the motions to a United States magistrate pursuant to 28 U.S.C. § 636(b)(1)(B) who, on October 17, 1988, issued a comprehensive report recommending that the Court grant defendants' motions. On November 21, 1988, plaintiffs filed written objections to the Magistrate's legal conclusions and to some of his factual findings. Because of the particular importance of the factual background, a necessarily lengthy recitation of the facts relevant to the summary judgment motions follows. This account is drawn heavily from the unobjected-to portions of the Magistrate Report but is supplemented in a few areas. Additionally, in setting forth the facts, the Court of course does so in the light most favorable to plaintiffs and indulges all inferences in favor of them for purposes of defendants' summary judgment motions. *See Ismert and Associates, Inc. v. New England Mutual Life Insurance Co.*, 801 F.2d 536, 537 (1st Cir. 1986).

Dina E. Fein, Fein, Schulman, Pearson and Emond, Springfield, Mass., for plaintiffs.

David B. Rome, Angoff, Goldman, Manning, Pyle & Wagner, Boston, Mass., for Local No. 1459.

David M. Marshall, Skoler, Abbott, Hayes & Presser, Springfield, Mass., for Suffield Poultry, Inc.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

This is a case filed by a group of past and present employees of defendant Suffield Poultry d.b.a. Royal Harvest Foods (hereinafter "Royal Harvest") against Roy-

### I. FACTS

Royal Harvest is a business engaged in processing chicken meat. The seventeen plaintiffs generally fall into two groups: those responsible for removing bones from slaughtered chickens (called "deboners"), and those responsible for packing the meat. The "deboners" were paid by the pound and the packers were paid by the hour.

The defendant Union, which was the recognized collective bargaining representative of the bargaining unit representing all Royal Harvest employees, entered into a CBA with Royal Harvest on August 1, 1983 which was in effect at all times during the present dispute. A few of the CBA's provisions are important to the case. They are:

ARTICLE 4—MANAGEMENT:

... Management rights and prerogatives include, but are not limited to, the exclusive right ... to determine the schedule of work and days of work; ... to determine, control, plan and change over-time work schedules....

....

ARTICLE 6—UNION REPRESENTATIVES AND STEWARD:

....

*Section 5.* The only person qualified to interpret this Agreement on behalf of the Union shall be the Business Agent of the Union.

....

ARTICLE 8—WORK INTERRUPTION—STRIKES AND LOCKOUTS, ETC.:

*Section 1.* The Union and the employees agree that they will not during the term of this Agreement for any reason including an actual or alleged unfair labor practice within the meaning of the National Labor Relations Act, assist, authorize, cause, condone, encourage, permit, support, threaten or participate in any strike, walkout, sitdown, slowdown, boycott, picketing, work stoppage, refusal to work or any interference in any form or manner with the operations, business or any of the functions of the Employer.

....

*Section 4.* ... The Union and the employees agree that in the event any employee or employees engage or participate in any of the conduct described in Section 1 of this Article, directly, indirectly or by any means whatsoever, including a refusal to cross any picket line on Employer premises, the Employer may discipline or discharge said employee or employees....

ARTICLE 10—HOURS AND OVERTIME:

....

*Section 7.* The provisions of the foregoing Sections of this Article shall not be deemed a guarantee by the Employer that any particular number of hours of work will be available nor in any way limit or restrict the right of the Employer to schedule overtime work, to make changes in the starting time of the hours of work, to assign work to the Employees or to transfer one or more Employees from one department to another or from one job to another, permanently or temporarily, except as specified in Section 6 of this Article.

Agreement Between United Food and Commercial Workers Union and Royal Harvest Foods, Inc., Exhibit A to First Amended Complaint.

Many of Royal Harvest's employees are Hispanic and do not speak or read English and there is a dispute as to whether some of the plaintiffs ever received a copy of the CBA, although Spanish translations of it were prepared, posted on the employer's premises and regularly distributed to employees by the Union. Plaintiffs maintain that the Union never explained the grievance process to them and that they were unaware they could file written grievances with the Union or their employer.

In their complaint, plaintiffs contend that starting late in 1984, Royal Harvest management began a policy of forcing them to work beyond their normal working hours without paying overtime which, according to them, violated the terms of the CBA. Employees refusing to work these extra hours were suspended. Royal Harvest maintains that the CBA allowed them to require employees to work beyond their scheduled shifts even if they notified employees of this requirement as late as when they began their shift in the morning.

The defendant Union's business representative is Tom Clarke who, pursuant to the CBA, is the only person authorized to interpret the CBA for the Union. Clarke's actions are critical to the parties' dispute. Through his regular visits to Royal Harvest and his relationship with its employees, he was generally aware that the em-

ployees were unhappy with their employer's practice of requiring them to work additional hours without scheduling them in advance and that some employees were suspended for refusing to do so. According to plaintiffs, but denied by Clarke, Clarke told them that Royal Harvest's practice of keeping them beyond the normal shift would be discontinued and disciplined employees would be reimbursed for the lost pay. Regardless of what Clarke did or did not say, the practice was not discontinued and the employees were not reimbursed.

The employees' discontent peaked on June 5, 1985 when plaintiff Hector Martinez telephoned Clarke and told him that the first shift "deboners" were planning on refusing to work the next morning and asked him to meet them at the plant in the morning before their shifts were scheduled to commence. Early in the morning on June 6, 1985, Clarke met with both the plaintiff "deboners" and Royal Harvest management in an attempt to resolve the problem, but Royal Harvest refused to discuss the issue while under threat of a strike. Many of the "deboners" followed through with their threat and struck Royal Harvest before their shift began on June 6th. They said they would not go back to work until their employer provided written assurances that the shift-extension practice would be halted.[1]

Plaintiffs claim, but Clarke denies, that once the strike began, Clarke told the strike's leaders that more employees were needed to join the strike in order for it to be effective. Hourly employees who were getting ready to begin their shift or who were already working supposedly overheard this statement. Later, some of the striking "deboners" solicited some of these hourly employees to join them in the strike, which they did.

Richard Abdow, the Union's president, came to the plant on June 6th and, after conferring with Royal Harvest managers, he informed all striking employees that they had been fired for engaging in an illegal wildcat strike. It is undisputed that these terminations were authorized under the CBA. There *is* a dispute, however, as to whether plaintiffs knew beforehand that they could be terminated for striking or whether the Union ever made them aware of this.

Out of the seventeen plaintiffs fired, sixteen reapplied for their jobs on June 19, 1985. Six of them were eventually rehired. The hourly employees among those rehired were stripped of their previous seniority and compensated at the same rate as new employees. Plaintiffs retained counsel who wrote to the Union's president requesting that the Union investigate and grieve Royal Harvest's continued practice of supposedly operating in noncompliance with the CBA. Counsel also complained that the employees were not being compensated in the amount required by the CBA and that plaintiffs objected to their lost seniority, unauthorized pay deductions and plant conditions which allegedly posed a risk to their health and safety. The Union refused to further investigate or grieve these matters maintaining that a grievance would be futile because they firmly believed that Royal Harvest had a right under the CBA to require its employees to work extended shifts without scheduling them ahead of time. The Union told its members that, unfortunately, they would have to wait until the CBA expired and then attempt to negotiate more favorable terms on this issue.

Plaintiffs then filed the present suit pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and 28 U.S.C. § 1337 claiming that Royal Harvest

---

1. Although at the outset of this litigation the overtime payment was an issue, at some point that part of the dispute fell to the wayside. This may be due to a provision in the CBA indicating that the employer did not have to pay more to plaintiffs for the limited additional time they were required to work as long as they were not required to work over forty hours per week. In any event, the employees were mainly upset at Royal Harvest for requiring them to work what they considered to be unscheduled overtime and this, apparently, was the sole reason for the strike.

breached the CBA and the Union violated its duty of fair representation.

## II. DISCUSSION

■ The law is clear that since plaintiffs acted in technical violation of the CBA by failing to adhere to the grievance procedure set forth therein and then by staging a wildcat strike, they must prove that the defendant Union violated its duty of fair representation before they may prevail in the breach of contract count against Royal Harvest. *See Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967); *Demars v. General Dynamics Corporation,* 779 F.2d 95, 97 (1st Cir.1985). Thus, the initial question is whether plaintiffs have come forth with sufficient evidence indicating that the defendant Union violated its duty of fair representation. If plaintiffs fail on this issue, it will be unnecessary for the Court to proceed to the breach of contract count against the employer.

■ In contemplating a motion for summary judgment, the Supreme Court has directed trial judges to ask whether a reasonable jury could find for the nonmoving party in light of the substantive standard governing the legal issue in question. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). That is, although all facts must be viewed in the light most favorable to plaintiffs, the evidence must be examined "through the prism of the substantive evidentiary burden." *Id.*

As the Magistrate correctly explained, plaintiffs have a difficult burden in this case. In determining the governing substantive standard, the Court begins and ends its analysis with *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The plaintiffs in *Vaca,* like the ones in the present case, did not comply with the grievance process as required by a collective bargaining agreement, but claimed they were prevented from doing so because of their union's wrongful refusal to file a grievance and, thus, sued their union in federal court for breaching the duty of fair representation. *Id.* at 185, 87 S.Ct. at 914. Relying on prior precedent, the Court wrote that for plaintiffs in this type of situation to establish a breach of the duty of fair representation, they must prove the union's conduct toward a member of the collective bargaining unit was arbitrary, discriminatory or in bad faith. *Id.* at 190, 194, 87 S.Ct. at 916, 918; *see Ford Motor Co. v. Huffman,* 345 U.S. 330, 337-9, 73 S.Ct. 681, 685-7, 97 L.Ed. 1048 (1953). Compounding plaintiffs' problems in cases like these is the maxim that unions are to be accorded broad discretion in determining whether to grieve a particular dispute. *Id.* at 338, 73 S.Ct. at 686.[2]

Stated succinctly, to overcome defendants' summary judgment motions, plaintiffs in the present case must come forth with evidence indicating that the Union's refusal to grieve their claim that Royal Harvest was violating the CBA by ordering unscheduled overtime was arbitrary, discriminatory or in bad faith.

With the substantive evidentiary burden identified, the Court now turns to the evidence pertaining to plaintiffs' claims. The essence of plaintiffs' assertion both in their opposition to summary judgment and the present objections to the Magistrate's Report is that the Union's action and inaction with respect to pursuing grievances on their behalf amounted to arbitrary, discriminatory and bad faith conduct. Taking the facts in the light most favorable to plaintiffs, they repeatedly complained to the Union that Royal Harvest had no right to require them to work unscheduled overtime, yet the Union—through Clarke—refused to grieve the matter. Realizing the *Vaca* standards are an issue, plaintiffs

---

2. The reason for this discretion is compelling. Through negotiation, the Union and employer have created a detailed process whereby employee complaints may be grieved. *See* Exhibit A to Plaintiffs' First Amended Complaint. In order for this process to work in an orderly fashion and be taken seriously by management, the Union must only grieve matters they determine to be legitimate. If every employee complaint were grieved, no matter how frivolous, the system would self-destruct. *See Vaca v. Sipes,* 386 U.S. at 191–93 and n. 15, 87 S.Ct. at 917–18 and n. 15.

present three scenarios in their objections which they perceive to be evidence supporting their position that the Union's conduct was arbitrary, discriminatory and in bad faith. Each will be discussed.

*A. Failure to File Grievance*

■ Plaintiffs first maintain that the Union "had a history of grieving, and in fact resolving, employee complaints for which there was little or no basis in the contract." While if supported by evidence in the record, this claim would certainly be indicative of a *Vaca v. Sipes* violation and, therefore, grounds for denying defendants' summary judgment motions, plaintiffs have not come forth with any reliable evidence tending to prove the allegation. Plaintiffs make much of Clarke's decision to file a meritless grievance for a Royal Harvest employee named Ramon Maldonado, who supposedly was friendly with Clarke, and contend that the decision to pursue his baseless grievance, while refusing to proceed on theirs, shows Clarke acted in a discriminatory fashion in grieving employee complaints. Yet, although Clarke admitted Maldonado's grievance had little support, he filed it in an attempt to reduce the sanctions imposed on him by the employer. This is the only evidence plaintiffs assert as supportive of their position on this issue. The Court finds that, without more, no reasonable juror could rely on this as sufficient evidence of discriminatory conduct by the Union.

With respect to the Union's failure to file a grievance in the present case, there was, at best, a disagreement between the Union and plaintiffs over the interpretation of the CBA. Plaintiffs say Royal Harvest did not have the right to order employees to work beyond their shifts without scheduling it beforehand, and the Union said it did. Assuming for summary judgment purposes that the Union's position was incorrect and that plaintiffs did have a legitimate issue for grievance, the Court cannot conclude that Clarke's refusal to grieve the matter was arbitrary, discriminatory or bad faith conduct, especially when considering the deference to be accorded to such Union decisions. *Ford Motor Co. v. Huffman,*

345 U.S. at 338, 73 S.Ct. at 686; *Early v. Eastern Transfer,* 699 F.2d 552, 557 (1st Cir.), *cert. denied,* 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983).

Additionally, unlike the situation in cases such as *De Arroyo v. Sindicato de Trabajadores Packing House, AFL–CIO,* 425 F.2d 281, 284, *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970), wherein a claim of unfair representation was established by showing that the Union totally failed to investigate or disclose an opinion on the validity of an employee's complaint, evidence in the present case shows that the Union did initially investigate the strength of plaintiffs' complaint regarding Royal Harvest's extended shift practice and told Union members that their dispute was meritless in light of the CBA. For these reasons, the Court finds that the Union did not violate its duty of fair representation when it refused to grieve the overtime dispute.

*B. Misrepresentation*

■ Plaintiffs next contend that the Union breached its fair representation duty by misleading them into believing their complaints would be addressed by Royal Harvest and, later, that progress was being made on the issue. The Court interprets this argument as similar to the one just discussed above: that the Union should have formally grieved the dispute. It is clear from the record that the Union—through Clarke—did make representations to Royal Harvest employees to the effect that it was attempting to settle or resolve the employer's practice of requiring employees to work beyond their shift. The record also shows that he followed through with this by discussing the overtime issue with Royal Harvest management but did not file a formal grievance. Yet, simply because the Union chose to voice its objections informally, rather than by formally grieving what they considered to be a losing battle, does not render the statements made to plaintiffs misrepresentations or violative of the duty of fair representation.

*C. Inducing Employees to Strike*

■ Plaintiffs' final allegation is that the Union affirmatively misled them by induc-

ing and/or encouraging them to strike. In its essence, plaintiffs here are arguing that they did not know that if they went on strike they could be fired and, because Clarke induced them to strike, the Union breached its duty of fair representation.

The Magistrate dismissed this issue by concluding that, even if Clarke told the strikers in order for their walkout to be successful they needed to solicit others to join, such statements were, contextually, harmless because they were made *after* plaintiffs went on strike. Thus, the comments could not have had any impact on the employees' decision to strike. The Magistrate also observed that Clarke and Royal Harvest managers made warnings to the employees, translated into Spanish, that they would be fired if they went on strike. Moreover, many of the employees admit in deposition testimony that they knew they might lose their jobs if they went on strike.

Plaintiffs specifically object to the Magistrate's decision on this question. According to plaintiffs, at least some of them did not decide to strike until Clarke made the statements in dispute which they say induced them to join the strike.

After closely scrutinizing the record, the Court agrees with plaintiffs that, viewing the record in the manner most accommodating to them, there is a factual question as to whether any of them decided to strike only because of Clarke's statements, and whether they knew such a strike was illegal. Drawing all inferences in plaintiffs' favor, the following scenario is factually supported. Clarke and others warned the "deboners" planning to walk out that wildcat strikes were illegal and they would be fired for doing so. Yet, the first set of employees were adamant and began the strike. After attempting to work out a compromise or settlement, Clarke knew he could not get the striking "deboners" back to work. Accordingly, while speaking to some of the "leaders" of the strike, Clarke told them that in order for the strike to be

effective, they needed more employees to join in. *See* Deposition of Hector Martinez at 91 (Clarke said "I shouldn't be telling you this, but I'll tell you anyway: In order for you guys to win what you're doing, you should get more people out."); Affidavit of Cristobal Henriquez at 23 ("[When Clarke] spoke about the strike, [he said] the only way we can do it the right way is if we get more people. If more people backed us up we could come up with something good."). Although these employees were already on strike, there is evidence in the record that these comments were heard by then-non-striking employees who, relying on them, decided to join the walkout. *See* Affidavit of David Arocho attached to Further Opposition to Motion to Dismiss, Exhibit B ("I stayed out of work on June 6, 1985 because I heard Tom Clarke saying to Hector and Cristobal that they needed more people to join them."); Deposition of Wilma Santos at 75–76 (stating she initially refused to join the walkout but did so later after she heard Clarke say the strikers needed more people).

Additionally, although he did not personally hear Clarke utter the words, at least one other plaintiff claims that Hector Martinez, who was supposedly acting upon Clarke's statements, solicited him to join the strike and told him that the Union would support the strikers. *See* Deposition of Felix Martinez at 14.

Although Clarke denies ever having made these statements, this Court must accept as true for summary judgment purposes sworn statements made by some of the plaintiffs in affidavits and depositions to the effect that they either heard Clarke make the comments or were told what he said through intermediaries, and that they relied on this information in deciding to join a strike for which they did not know they could be fired.

Ordinarily, this would end the matter and the Court would order the case to proceed to trial, at least insofar as the defendant Union is concerned.[3] Yet, in order for

---

**3.** It is doubtful whether Royal Harvest would remain in the suit. To hold an employer liable when there is a CBA in existence providing a grievance process with which plaintiffs did not comply, plaintiffs must prove that the employer violated the contract. *See Demars v. General*

these factual questions to get to the jury, plaintiffs must prove to the Court's satisfaction that, if their allegations are proved, such wrongdoings constitute a breach of the Union's duty of fair representation. Since this is a purely legal question, briefed by both parties, the Court will proceed to address it.

Without explaining why, plaintiffs presume that if Clarke's comments induced them to strike, there would be a breach of the Union's duty of fair representation. This result is not so readily apparent to the Court. Interpreting the principles set forth by the Supreme Court in *Vaca v. Sipes*, the First Circuit has written that an employee who has failed to exhaust the governing grievance process has the right to sue directly in federal court for breach of contract claims in one of two situations:

The first is when "the conduct of the employer amounts to a repudiation of th[e] contractual procedures." *Id.* (citation omitted). The second is when "the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if ... the [employee] has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance." *Id.* (emphasis in original). A "wrongful" refusal is one in which the union has breached its duty of fair representation to the employee. *Id.* [386 U.S.] at 186, 87 S.Ct. at 914–15. And a breach occurs "only when the union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916 (citations omitted). *See also Hines v. Anchor Motor Freight Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) (enforcement of an arbitrator's decision where the arbitrator has erred, is conditioned upon the union's having satisfied its statutory duty fairly to represent the employees in connection with the arbitra-

*Dynamics Corporation,* 779 F.2d at 97. As mentioned above, the Court finds Clarke's interpretation of the overtime provision of the CBA—an interpretation which defendant Royal Harvest shares—entirely reasonable and it is unlikely the breach of contract issue would ever get to

tion proceedings). *Vaca v. Sipes*, in essence, created two exceptions to the exhaustion requirement established in *Republic Steel [Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965)]: conduct by the employer repudiating the contractual procedures or the wrongful refusal by the union to process the grievance.

*Williams v. Sea–Land Corporation*, 844 F.2d 17, 18–19 (1st Cir.1988).

With respect to the present issue in this case, plaintiffs claim the Union breached the duty of fair representation by inducing them to strike. Unlike plaintiffs' previous claim regarding the Union's refusal to file a grievance, this claim does not appear to trigger either of the two situations allowing plaintiffs to directly sue in federal court without exhausting the grievance process. In other words, even if Clarke induced employees to strike, plaintiffs may have no grounds to sue the Union for that wrong. At the very least, it is unclear whether such a wrong violates the duty of fair representation as that right has been defined by courts. Along these lines, defendant cites a recent Sixth Circuit case holding that a union, which encouraged a work stoppage without informing its members of the potential consequences, did not breach its duty of fair representation. *See National Labor Relations Board v. Local 299, International Brotherhood of Teamsters*, 782 F.2d 46 (6th Cir.1986). The court explained:

This position would require us to extend the duty to cover a situation involving a work stoppage rather than collective bargaining or grievance processing, and where a member or group was not singled out for different treatment. In other words, the duty would be expanded to include an undefined fiduciary duty which a union owes to its unit as a whole. Such a duty could impose on a union an obligation to authorize a strike, or any

the jury. *See Early v. Eastern Transfer,* 699 F.2d at 557. The Court need not answer this legal question, however, due to its finding that the Union has not violated its duty of fair representation.

number of other affirmative actions. We decline to extend the duty so far, since we believe the duty of fair representation was never intended to be a "catch all" for undesirable union activity.

*Id.* at 51. The Sixth Circuit concluded by unequivocally holding that the duty of fair representation is implicated only when an individual or group is treated differently by a union from other members through arbitrary, discriminatory or bad faith conduct. *Id.* at 51–52.

Two other cases cited by defendant warrant discussion. In *Shasteen v. United Textile Workers of America*, No. 4-86-28, U.S. District Court Memorandum and Order (D.Tenn. January 22, 1987), *affirmed without opinion*, 838 F.2d 472 (6th Cir. 1988), plaintiff union members brought suit against their employer for violation of a collective bargaining agreement and their union for breach of the duty of fair representation claiming the union initially encouraged, and later disavowed any involvement in, an illegal strike. In granting defendant's motion for summary judgment, the district court held that, because there was a CBA provision clearly stating strikes were illegal, it did not matter whether the union encouraged the strike. Thus, because the employer did not breach the CBA, the court found it unnecessary to proceed to the fair representation claim. On appeal, the Sixth Circuit, adopting the opinion of the district court, affirmed the judge's decision granting defendant's motions for summary judgment.

Finally, in *Swatts v. United Steelworkers of America*, 585 F.Supp. 326 (S.D.Ind. 1984), plaintiff union members brought an action against their union complaining that it breached its duty of fair representation by, in part, actively misleading and misinforming its employees of the potential consequences of a strike. Finding no evidence of affirmative misrepresentation, the district court granted defendant's motion for summary judgment on the fair representation count. On appeal, the Seventh Circuit affirmed holding there was "no evidence of the kind of intentional, invidious, affirmative misstatement that would seem to be consistent with what this circuit has re-

quired before finding a breach of the duty of fair representation in the context of a union's handling of grievances." *Swatts v. United Steelworkers of America*, 808 F.2d 1221, 1225 (7th Cir.1986). Additionally, the court was persuaded somewhat by the fact that the information about which the union failed to notify its employees was widely known or readily accessible to the union members. *Id.*

It is difficult to predict whether the First Circuit would concur with the *NLRB* and *Shasteen* cases and constrain a union member's fair representation right by concluding that the right is not triggered by a union's conduct of encouraging its members to join an illegal wildcat strike without warning them of the consequences. Assuming for the purposes of summary judgment, however, that the First Circuit would extend this right to a case such as the present action, plaintiffs have failed to come forth with sufficient evidence that the Union's conduct rises to the level of a violation consistent with *Vaca v. Sipes*. First, the record evidence strongly indicates that the atmosphere at the Royal Harvest plant was such that everyone knew a strike was illegal. Deposition testimony and affidavits show that the Union constantly distributed both English and Spanish versions of the CBA, which clearly prohibits strikes. The Court notes there is conflicting evidence on this issue and that some of the plaintiffs claim they never received a copy of the CBA. Yet, this does not take away from the Court's belief that, although some of the plaintiffs may not have received a copy of the CBA, such copies were readily available and easily accessible. Also, at a meeting held shortly before the strike, Clarke unequivocally told Royal Harvest employees present that their planned strike was illegal. Finally, Royal Harvest management and Union representatives once again in both English and Spanish warned employees that the strike was illegal and that they would be fired for such action.

Second, even if a few of the plaintiffs did not know the strike was illegal and were induced by Clarke's comments to join the

walkout, the Court finds that none of Clarke's statements can be considered the type of affirmative misrepresentations which courts have held may be the basis for an unfair representation suit. *See Swatts v. United Steelworkers of America*, 808 F.2d at 1225. Rather, even in the light most favorable to plaintiffs, the situation was one where Clarke repeatedly told Royal Harvest employees planning to strike that it was illegal and that they could be fired. He attempted to work out a settlement that would convince employees they should not strike, but this failed and the employees collectively decided to stage the wildcat strike. At this point, Clarke purportedly made the statement in dispute by telling striking "deboning" employees—who undoubtedly knew the potential ramifications of their actions—that the strike would not be effective unless they got more employees to join in. These comments may have been overheard by non-striking employees who later joined the strike. Importantly, nothing in the record shows that Clarke told employees to strike. As defendants assert, Clarke was merely stating a truism to the strikers: that strikes, even illegal ones, achieve their desired purposes only when widely supported and joined by a large percentage of the work force.

Assessing plaintiffs' right to seek judicial redress against the Union for Clarke's actions, the Court once again turns to *Vaca v. Sipes*. There is no evidence other than that Clarke was acting in the employees' best interests during the events leading up to, and including, the strike. Thus, there was no bad faith. The Court has previously rejected plaintiffs' claim that Clarke acted in a discriminatory fashion in representing Union members. And, nothing Clarke did can be deemed arbitrary. The Court repeats that at all times Clarke acted in a manner he believed to be in the best interests of the employees. As unfortunate as Clarke's comments may have been, they were negligent at best. Mere negligence may not support a suit such as this. *See Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 301,

91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971); *Early v. Eastern Transfer*, 699 F.2d at 555. Simply stated, plaintiffs' evidence falls far short of that necessary to prove a violation of the duty of fair representation in the First Circuit pursuant to *Vaca v. Sipes*. *See, e.g., Williams v. Sea–Land Corporation*, 844 F.2d at 21; *Teamsters Local Union No. 42 v. National Labor Relations Board*, 825 F.2d 608, 614 (1st Cir.1987).

## III.  CONCLUSION

For all reasons stated above, the Court OVERRULES plaintiffs' objections and ADOPTS the Magistrate's October 17, 1988 Report and Recommendation in its entirety. Defendants' motions for summary judgment are hereby GRANTED. The Court orders the Clerk to enter judgment for defendants.

It is So Ordered.

